| | |
|---|---|
| Larry Holmberg, a Minnesota resident, | Case No: 17-CV-01577 PJS/LIB |
| Plaintiff, | |
| v. | AMENDED COMPLAINT |
| Jeffrey B. Peel, an Iowa resident, Tara Peel, an Iowa resident, Benjamin B. Stern, a Wisconsin resident, Benjamin A. Thorud, a Wisconsin resident, Kara Michelle Wales, an Iowa resident, and Tactacam, LLC, a/k/a Tactacam Limited Liability Company, a Wyoming limited liability company, | |
| Defendants. | |

## INTRODUCTION

Plaintiff, Larry Holmberg, a Minnesota resident ("Plaintiff"), as and for his Complaint against Defendants, Jeffrey B. Peel, an Iowa resident, ("Defendant J. Peel"), Tara Peel, an Iowa resident, ("Defendant T. Peel"), Benjamin B. Stern ("Defendant Stern"), a Wisconsin resident, Benjamin A. Thorud ("Defendant Thorud"), a Wisconsin resident, Kara Michelle Wales ("Defendant Wales"), an Iowa resident, and Tactacam LLC, a/k/a Tactacam Limited Liability Company, a Wyoming limited liability company ("Defendant Tactacam") states and alleges:

## PARTIES

1. Plaintiff is a Minnesota resident who resides in Princeton, Minnesota within Mille Lacs County.

2. Defendant Tactacam is a Wyoming limited liability company, registered to do business as a foreign limited liability company in Minnesota, with its principle place of business in Caledonia, Minnesota.

3. Defendant Tactacam markets, distributes and sells video cameras suitable for the rigors of outdoor sports, such as hunting, under the Tactacam brand (hereinafter "action cameras").

4. Tactacam's customers can buy Tactacam products through multiple channels, including online at Tactacam's website (www.tactacam.com), at several hundred archery stores and in a variety of "big-box" stores such as Cabelas/Bass Pro Shops, Walmart, Dick's Sporting Goods and on eBay.com and Amazon.com, among others.

5. Defendant J. Peel is an Iowa resident, residing in Winneshiek County, at 1105 Ferris Mill Rd, Decorah, IA 52101-7627 and is a managing member of Defendant Tactacam.

6. Tara Peel is an Iowa resident, residing in Winneshiek County, at 1105 Ferris Mill Rd, Decorah, IA 52101-7627 and is a member of Defendant Tactacam and provides bookkeeping services for the company.

7. Benjamin B. Stern is a Wisconsin resident, residing in La Crosse County at 319 Kenneda Street, Holmen, WI 54636-8808 and is a member of Defendant Tactacam and holds himself out as a founder of Defendant Tactacam.

8.  Benjamin A. Thorud is a Wisconsin resident, residing in La Crosse County at 702 Granum Circle, Holmen Wisconsin 54636-9551 and is a member Defendant Tactacam.

9.  Kara Michelle Wales, is an Iowa resident, residing in Winneshiek County at 1651 Old Stage Road, Decorah, Iowa 52101-7379, who does business with and at Tactacam's location in Caledonia, Minnesota under the name "Just for Does," a retailer of hunting related products, and is a member of Defendant Tactacam.

## Jurisdiction

10. Defendants removed this case from state court to this court on May 11, 2017, pursuant to 28 U.S.C. §§ 1332, 1441, and 1446. (Dkt. No. 1, filed 5/11/17.)

## Factual Allegations

### A.  Tactacam Startup

11. Prior to March 4, 2014, Defendant J. Peel had purchased the assets of a Wisconsin-based business that included an unknown number of cameras covered by Plaintiff's patents.

12. Upon information and belief, the Wisconsin limited liability company was set up to sell hunting related cameras.

13.  Prior to March 4, 2014, Defendant J. Peel had purchased the assets of a Wisconsin-based business that included an unknown number of cameras covered by Plaintiff's patents.

14.  Upon information and belief, in about 2014, Defendant J. Peel and Defendant T. Peel, along with their business partners in Wisconsin, Defendant Stern and Defendant Thorud, acquired the assets of Tactacam LLC, then a Wisconsin limited liability company from Randy Hoff, a Wisconsin resident and businessman.  At that time, Tactacam's assets included a number of a single model of a waterproof action camera ("Tactacam 1.0")

15.  Defendant J. Peel, Defendant Stern, Defendant Thorud, and Defendant T. Peel, intended to start up a company selling hunting-related products in southern Minnesota and had a particular interest in Plaintiff's patented technology for cameras, mounts, and related accessories with uses applicable to the hunting industry and that may be used as hunting-related cameras that mounted on a bow or the barrel of a firearm and were capable of recording in high definition a sportsperson's hunt.

16.  Upon information and belief, sometime after its startup in 2014, Defendant Wales made a contribution to Defendant Tactacam and become a member thereof.

### B. Holmberg Patent License Agreement

17. Sometime thereafter, Defendant J. Peel contacted Plaintiff to negotiate for the rights for a license under several U.S. Patents owned by Plaintiff.

18. On about March 4, 2014, Defendant J. Peel and Plaintiff reached an agreement and entered a contract entitled *Holmberg Patent License Agreement* ("Agreement"). A copy of the Agreement is attached and incorporated by reference as Exhibit A.

19. In the Agreement, Plaintiff granted J. Peel a non-exclusive license under Plaintiff's patents and patent applications relating to mounts and cameras and attached to the Agreement as Schedules A and B respectively. Copies of Schedules A and B are attached to Exhibit A.

20. The Tactacam 1.0 action cameras were Licensed Products under Plaintiff's U.S. Patent Nos. 7,006,144 and 8,035,735.

21. The Agreement granted Defendant J. Peel a "non-exclusive right and personal royalty-bearing license to practice the methods and to make, have made, use, offer for sale, sell, and import LICENSED PRODUCTS in the U.S." ("Licensed Products"). *Agreement*, Section 1.

22. In exchange, the Agreement required Defendant J. Peel to make an initial licensing fee payment of fifty thousand dollars ($50,000.00) in three installments, which Peel completed.

23. The Agreement further required Peel to pay a seven and a half percent (7.5%) royalty to Plaintiff on NET SALES of Licensed Products, up to the sale of 10,000 cameras, after which the royalty rate would be reduced to five percent (5%)("Royalty Payments"). *Id.*, Section 4.1(b).

24. The Agreement defines "*"NET SALES"* as comprising gross sales minus returns and discounts, and minus sales tax and shipping charges included in the gross sales. *Id.*, Section 4.1(b).

25. The Agreement provides for quarterly Royalty Payments to be made to Plaintiff within twenty-five (25) days of the end of each calendar quarter. *Id.*, Section 4.2.

26. The Agreement provides that royalty payments "be accompanied by a report including an identification of the LICENSED PRODUCTS sold, the number of units sold, gross sales, NET SALES, and royalty calculations for LICENSED PRODUCTS sold during the quarter, as well as cumulative totals for the calendar year" ("Royalty Report"). *Id.*

27. Under the Agreement, Plaintiff was to receive Royalty Payments and Royalty Reports at his address in (changed per notice as provided in the Agreement) Princeton, Minnesota from Defendant J. Peel for under the Agreement ("Licensed Products") by the 25th of the first month of each quarter for the preceding quarter.

28. All Royalty Payment checks received were drawn on a bank account of Defendant Tactacam.

29. The Agreement required Defendant J. Peel, "to mark all LICENSED PRODUCTS sold or otherwise disposed of by him with the proper patent numbers of LICENSED PATENT RIGHTS set forth in Schedules A and B." *Id.*, Section 6.1.

30. The Agreement provides that the license "may be assigned or transferred by LICENSEE as part of a sale, merger, or other transfer of the business of LICENSEE. . . provided that the transferee agrees to assume all obligations under this Agreement." *Id.*, Section 12.

31. At no time has Plaintiff ever received a notice that the license would be assigned or transferred due to a sale, merger or transfer of Defendant J. Peel's business.

32. The Agreement also provides that the license may not be sublicensed or assigned to a third party without Plaintiff's consent. *Id.*

33. At no time has Plaintiff ever agreed to a third-party sublicense, assumption or assignment of Defendant J. Peel's rights under the Agreement.

**C. First Royalty Payment**

34. On about June 12, 2014, with the first Royalty Payment almost due under the Agreement, Plaintiff received an email from Defendant J. Peel alleging that Plaintiff breached the Agreement based on unsubstantiated rumors that

Defendant J. Peel purportedly heard from a secret undisclosed source however, that the rumors came from another unknown and unidentified person on the other side of the globe.

35. Beginning the first quarter of the Agreement being in place, Defendant J. Peel has repeatedly been unable to timely comply with the specific terms of the Agreement and make the Royalty Payments and produce the Royalty Reports by the prescribed and agreed upon deadline.

36. When the first Royalty Report was due and not delivered to Plaintiff from Defendant J. Peel on about July 25, 2014, Defendant J. Peel went into default under the Agreement for the first time.

37. Plaintiff may give written notice of his intention to terminate the Agreement if Defendant J. Peel breaches, which then triggers a thirty (30) day period for Defendant J. Peel to remedy the breach, or Plaintiff may immediately terminate the Agreement. *Id.*, Section 14.

38. The Agreement by its terms does not require Plaintiff to provide for any cure period under it before termination if the licensee breached the Agreement. *Id.*

39. Plaintiff placed Defendant J. Peel on notice of his default by email for not making the first payment on time; thereafter, Defendant J. Peel eventually cured the default.

40. The first royalty report reported sales of Tactacam 1.0 action cameras designated as "camera – flat black" and the royalties due for such sales, which was paid.

41. The Tactacam 1.0 camera included a slot for a micro SD storage card, and a battery, all housed in a cylindrical weatherproof housing. The SD card and battery were accessible via a cylindrical, removable cover that forms a weather proof seal at one end of the housing.

**D. 2015 Second Quarter Royalty Report**

42. For the second quarter 2015 Royalty Payment and Royalty Report, Defendant J. Peel failed to provide a Royalty Report that complied with Section 4.2 of the Agreement and that accounted for sales and other information as required.

43. Plaintiff again placed Defendant on notice of his default under the Agreement for failing to produce the second quarter Royalty Report

44. Although a hand-written recreation of the second quarter Royalty Report was eventually provided by Defendant T. Peel, it does not appear to be based on any corroborating data since none was provided during a subsequent audit and the hand-written report was only turned over after repeated demands had been made and well over a year since it was due under the Agreement.

45. Royalties paid for the second quarter of 2015 were based on reported sales of a new model of Tactacam camera designated as "Tactacam 2.0."

46. Like the Tactacam 1.0 cameras, the Tactacam 2.0 cameras included a slot for a micro SD storage card, and a battery, all housed in a cylindrical weatherproof housing.   The SD card and battery were accessible via a cylindrical, removable cover that formed a weather proof seal at one end of the housing.

47. All royalty payments and royalty reports received by Plaintiff for the remainder of 2015 and for a portion of 2016 were for sales of Tactacam 2.0 cameras.

48. Tactacam continues to sell and offer for sale the Tactacam 2.0 cameras.

**E.    No On-Line Sales Reported**

49. None of the reported sales information provided quarterly revealed any sales made through Amazon.com or Tactacam.com or through other online sites for online sales made by Defendant Tactacam despite its extensive and prevalent presence online saturated with offers to sell the Licensed Product through those means.

50. Likewise, itemizations were not clearly made for any other classifications of sales such as trade shows, direct sales or otherwise.

51.   On about July 22, 2015, Plaintiff demanded Defendant J. Peel provide a more detailed break out of the accounting in the Royalty Reports and, in particular, to have online sales separated from the other sales.

**F.   Hoyt Sales and Alleged Return**

52.   In the same demand, Plaintiff also requested validation of the purported 6000 cameras Defendant J. Peel had previously claimed to have sold to a reseller dealer, Hoyt Archery based in Salt Lake City, Utah.

53.   Almost a week later, Plaintiff responded but provided no documentation of the alleged sale of 6000 cameras and now stated that it was about 2000 cameras less than the number previously represented, constituting a downward adjustment to about 4000 cameras sold.

54.   Purportedly to appease and comply, Defendant J. Peel provided Plaintiff with a breakdown of online sales in an undated, overly simplistic and unsophisticated spreadsheet that allegedly itemized online sales.

55.   To date, Defendant J. Peel has produced no corroborating financial evidence of any sale where Hoyt Archery purchased the number of cameras he had represented, other than internally-created documents that cannot be confirmed by any third party with sufficient documentation.

**G.   Untimely 2015 Fourth Quarter Royalty Payment**

56.   On about January 25, 2016, Defendant J. Peel again failed make the Royalty Payment due that day for fourth quarter 2015.

57. Plaintiff emailed Defendant J. Peel to put him on notice he was in default under the Agreement.

58. Defendant J. Peel represented that he would be sending the Royalty Payment that day.

59. About a week later, after not receiving the Royalty Payment in the mail, Plaintiff again contacted Defendant J. Peel and was informed that he had now sent the check that day and that it was now in the mail with a tracking number to follow.

60. The check for the fourth quarter 2015 Royalty Payment arrived in mid-February 2016 but there was not a mandated Royalty Report included.

61. On about February 13, 2016, Plaintiff contacted Defendant J. Peel to thank him for the overdue Royalty Payment and to inquire into the lack of the requisite Royalty Report.

## H. Untimely 2016 First Quarter Royalty Payment

62. On about April 26, 2016 when the next Royalty Payment was overdue for first quarter 2016, Plaintiff contacted Defendant J. Peel to inquire into it and received the same story that the check had been sent and was in the mail.

63. Two days later, when no check had arrived, Plaintiff had to again contact Defendant J. Peel about his failure to make the payment before the check eventually arrived.

64. This untimely payment submission and promises of the check being sent was typical for almost all payments under the Agreement from Defendant J. Peel.

## I. Peel Claims Ownership of Patents

65. Around April 29, 2016, Plaintiff was informed that Defendant J. Peel had represented to Hoyt Archery that Defendant J. Peel and/or Defendant Tactacam owned Plaintiff's patent rights for the Licensed Products and that neither Defendant J. Peel nor Defendant Tactacam would pay Plaintiff for any more sales.

66. Plaintiff contacted Hoyt Archery to further investigate the alleged statement Defendant J. Peel had made and to determine if Plaintiff's rights had been violated by Defendant J. Peel.

67. Around April 29, 2016, Plaintiff received an email from Defendant J. Peel complaining about Plaintiff directly contacting Hoyt Archery and claiming to have been defamed due to the allegedly false statement that Defendant J. Peel was not timely in his payments to creditors.

68. There is no restriction in the Agreement prohibiting Plaintiff from contacting any of the licensee's customers.

69. There is no provision prohibiting Plaintiff from investigating any non-payment in the Agreement.

70. Defendant J. Peel asserted that Hoyt Archery allegedly had made a large return of about 2,000 cameras.

71. The amount alleged to have been charged back on the purported return of the Hoyt Archery purchased cameras were unilaterally deducted from subsequent Royalty Payments.

## J. Audit Requested

72. The Agreement requires Defendant J. Peel to "maintain at his principal office books of account and records of sales of LICENSED PRODUCTS under this Agreement. Such books shall be open to inspections and copying during usual business days and hours on reasonable notice of at least five (5) business days by HOLMBERG or an independent certified public accountant selected by HOLMBERG." *Id.*, Section 4.4.

73. The Agreement provides that if an inspection of the books of account and records of sales "reveals a discrepancy in the amount of royalty owed to HOLMBERG, LICENSEE shall pay such discrepancy, plus interest of one and one-half percent (1.5%) per month. If a discrepancy of more than five percent (5 %) is found, LICENSEE shall pay accountant's fees incurred in reviewing the records and identifying the discrepancy." *Id.*, Section 4.5.

74. On about July 15, 2016, Plaintiff's counsel provided Defendant J. Peel with a seven (7) day notice under Section 4.4 of the Agreement to produce all books and records for an audit of sales going back to June 2014.

75. In that notice, Plaintiff requested that these documents be produced for the audit:

   a. authorization of returned goods (licensed products);

   b. receiving reports showing receipt of any returns of the licensed products;

   c. credit memos or checks relating to returns of the licensed products;

   d. invoices for all sales of the licensed products;

   e. computation of sales and royalties for the licensed products;

   f. purchases of licensed products by Peel or Tactacam;

   g. inventory records for the licensed products; and

   h. communications between Peel or Tactacam and Fuse Archery Accessories.

**K.  August 6, 2016 Audit**

76. On about August 3, 2016, Dennis C. Anderson, CPA, Plaintiff's accountant, went to the Tactacam office in Caledonia, Minnesota to review and audit the books of account and records of sales of the licensed products under Section 4.2 of the Agreement.

77. Mr. Anderson reported that he did not receive all the records previously requested and indicated that during his audit the owners of Tactacam acted as if they were unaware of the records and schedules required for the audit.

78. At the audit, Defendants intentionally failed to produce the records to conduct the audit, the documents produced were incomplete, not in

compliance with those requested, and not in compliance with those required by the Agreement.

79. The financial records produced did not comply with generally acceptable accounting principles (GAAP).

80. The quarterly reports provided were not prepared by utilizing GAAP standards.

81. The accounting records that Defendants produced for the audit would not permit an accurate, reasonable or comprehensive audit of the sales reported to Plaintiff.

82. Defendants intentionally have withheld and concealed information from Plaintiff to manipulate, adjust, and hide the true sales of the Licensed Product to reduce the Royalty Payments they must make to Plaintiff.

83. Despite its widespread and ubiquitous presence online selling the Licensed Product through its own website, through its own store front on Amazon, "The Official Tactacam Store," certain Licensed Products listed as *Amazon Prime* products and Licensed Products in the top 100 ranking of best-selling Hunting and Trail cameras for sale on Amazon, the saturation of sales offers of the Licensed Product on eBay.com and the resulting designation as a "Top Pick" and "Top Selling Product," known sales online by Walmart, Dick's Sporting Goods and other high profile ecommerce sites, no audit information was provided for online sales.

84. Other than the one disclosure in July 2015, none of the Royalty Reports revealed any sales made online.

**L.  Underpaid Royalties**

85. The audit revealed that Tactacam had unilaterally reduced the rate it paid Plaintiff beginning in the first quarter of 2015 down to 7% for the royalty rather than the 7.5% specified in the Agreement.

86. After Plaintiff informed Defendants he knew of the underpayment on the Royalty Payments, Defendant Tactacam corrected the underpaying of the shorted Royalty Payments and then implemented a new shipping charging scheme.

**M.  Shipping Charges Scheme**

87. Defendants' new shipping scheme was implemented and then applied retroactively to recoup and offset the amounts repaid in properly accounted for Royalty Payments.

88. Defendant Tactacam created a shipping costs scheme not tied to any actual shipping costs it incurred but was set at 8% of the sale for all of its shipping costs no matter the size of the order, the manner of shipping, or actual shipping costs incurred.

89. Through the end of the third quarter 2016, the audit revealed that at least $18,378.25 had been deducted from the Royalty Payments under the shipping payment scheme.

## M.  Unverifiable Hoyt Returns

90.  During the audit, Mr. Anderson attempted to verify the alleged return of about 2,000 cameras by Hoyt Archery.

91.  After requesting evidence of the transaction he could use to verify the return, Mr. Anderson was provided with a single email alleged to have been from Hoyt Archery that only stated that Hoyt Archery had 2,310 cameras to send back.

92.  Mr. Anderson asked Defendants to provide him with independently verifiable information by having Hoyt Archery email confirming the return had occurred.

93.  Defendants represented that they had emailed to Hoyt Archery as requested, but to date no email from Hoyt Archery has substantiated the claimed return of the cameras.

94.  Defendants also provided Mr. Anderson with an invoice with 2,325 cameras on it dated July 8, 2016 but said that the returned camera information needed to be updated.

95.  Mr. Anderson could not tell if the invoice was related to the purported cameras Hoyt Archery allegedly returned.

96.  Defendants also provided internal accounting records represented to show that $257,120.00 was owed to Hoyt Archery in an aging payable summary, $257,120.00 was shown on an internally generated credit memo, and copies

of internally generated invoices to Hoyt Archery were provided that totaled $448,000.00—but none of the internal documents provided were sufficient for Mr. Anderson to verify the claimed return of the cameras.

97. Defendants provided no proof of payment to Hoyt Archery for $257,712.00 during the audit.

98. Defendant Tactacam unilaterally deducted about $20,000.00 from a subsequent Royalty Payment for the alleged Hoyt Archery returned cameras despite being unable to produce evidence of the return.

**N.    Audited 2015 Second Quarter Royalty Report Records**

99. Defendant Tactacam produced no records at the audit for sales in the second quarter of 2015.

100. The audit revealed that accounting for the second quarter 2015 would have been done by a prior accountant no longer providing services to Defendant Tactacam.

101. Defendant Tactacam has informed Plaintiff that Defendant T. Peel would "recreate" the withheld accounting records for second quarter 2015, but no original documents nor records support the "recreated" report.

**O.    Royalty Payments & Royalty Reports Stop**

102. Plaintiff has not received a Royalty Payment or a Royalty Report for sales during the fourth quarter of 2016.

103. On August 5, 2016, through his attorney, Plaintiff put Tactacam on notice it was in breach of the license agreement under Section 4.2 because Plaintiff had not received a Royalty Report.

104. During summer 2016 and continuing through the end of the year, Plaintiff and Defendants sought to forge a deal to purchase the patents but these efforts were unsuccessful.

105. On April 5, 2017, Plaintiff terminated the Agreement and served notice of the termination to Defendant J. Peel pursuant to paragraph 14.1 of the Agreement.

**P.    Licensed Product Sales Continue**

106. Defendant Tactacam, and other unauthorized entities, continue to sell Tactacam 2.0 cameras.

107. Sometime in 2016, Defendant Tactacam began selling and offering for sale video cameras under the designation "Tactacam 3.0" and "Tactacam 4.0." The Tactacam 3.0 and Tactacam 4.0 cameras include a slot for a micro SD storage card, and a battery, all housed in a cylindrical weatherproof housing. The SD card and battery are accessible via a cylindrical, removable cover that forms a weather proof seal at one end of the housing.

# Causes Of Action

## Count I: Breach of Contract: Failure to Pay Royalties; Royalties Reporting
### (Against Defendant J. Peel)

108. Plaintiff restates and realleges the preceding paragraphs of this Complaint.

109. The Agreement was a valid and enforceable contract, supported by consideration, and Plaintiff honored his obligations under the Agreement by providing the required rights to the Licensed Products to Defendant J. Peel.

110. Defendant J. Peel has breached the Agreement by failing to pay royalties as required under the Agreement.

111. Defendant J. Peel has breached the Agreement by failing to prepare Royalty Reports under the specifications in the Agreement to accompany all Royalty Payments to Plaintiff.

112. Due to this failure by Defendant J. Peel, Plaintiff cannot accurately determine or reasonably make an accounting of the correct Royalty Payments he is due under the Agreement.

113. Defendant J. Peel has breached the agreement by failing to comply with the audit demanded under the Agreement.

114. Defendant J. Peel has breached the Agreement by under paying the royalty percentage, under-reporting sales and enacting an unreasonable shipping charges scheme.

115. As a direct and proximate result of Defendant J. Peel's breaches of the Agreement, Plaintiff has been monetarily damaged in an amount, upon information and belief, to be in excess of fifty thousand dollars ($50,000.00) and to be determined by a Court-supervised accounting or at trial.

## Count II: Breach of Contract: Assignment
(Against Defendant J. Peel)

116. Plaintiff restates and realleges the preceding paragraphs of this Complaint.

117. The license granted to Defendant J. Peel provided for transferring the license if his business was sold or transferred and required the transferee to assume all obligations under the Agreement.

118. Defendant J. Peel assigned, sub-licensed or transferred his rights under the Agreement to a third party without Plaintiff's consent.

119. Defendant J. Peel assigned, sub-licensed or transferred his rights under the Agreement to one, some or all Defendants.

120. Defendant J. Peel has not sold, merged or transferred any business that the license in the Agreement pertains to or for which he has received Plaintiff's consent.

121. Defendant J. Peel has breached the Agreement by failing to provide documentation for any sale merger or transfer demonstrating an assumption of the Agreement.

122. Defendant J. Peel has breached the Agreement by failing to obtain Plaintiff's consent for any sale, merger or transfer which pertains to the the license granted in the Agreement.

123. As a direct and proximate result of Defendants actions and inactions alleged to breach the Agreement, Plaintiff has been monetarily damaged in an amount, upon information and belief, to be in excess of fifty thousand dollars ($50,000.00) and to be determined at trial.

## COUNT III: BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
### (Against Defendant J. Peel)

124. Plaintiff restates and realleges the preceding paragraphs of this Complaint.

125. In entering into the Agreement with Defendant J. Peel, Defendant J. Peel owed Plaintiffs covenant of good faith and fair dealing in the inducement to contract and in the performance of his Agreement with Plaintiff.

126. Defendant J. Peel breached his duties of good faith and fair dealing by inducing Plaintiff to continue under the Agreement by using false representations and material omissions regarding the e amount of sales, transfer of ownership interest without consent or notice to Plaintiff , by failing to provide Royalty Reports and make the correct Royalty Payments, by failing to keep and provide sufficient and accurate books and records and mitigating his damages, and by breaching the Agreement with Plaintiff.

23

127. As a direct result of Defendant Peels' breach of the covenant of good faith and fair dealing, Plaintiff has been denied Royalty Payments for each sale made by Defendants, lost profits, opportunities and the ability to fully maximize and monetize the Licensed Product within its finite life-span and other losses and damages for which Defendant J. Peel is liable to Plaintiff as a direct and proximate result of Defendant J. Peel's actions and inactions alleged to breach the Agreement, Plaintiff has been monetarily damaged in an amount, upon information and belief, to be in excess of fifty thousand dollars ($50,000.00) and to be determined as damages.

## COUNT IV: UNJUST ENRICHMENT
### (Against All Defendants)

128. Plaintiff restates and realleges the preceding paragraphs of this Complaint.

129. Defendants have failed to properly document the sales of Licensed Products and have together and individually acted to hinder, delay and underreport or overcharge under the Agreement.

130. Upon information and belief, Defendants have acted to deprive Plaintiff of the true and correct amounts due to him as Royalty Payments and cannot accurately ascertain with reasonable certainty the amounts due to him.

131. In the Agreement, Defendant J. Peel agreed to allow an audit and provide certain accounting information to Plaintiff and to pay for any audit that

demonstrates a discrepancy of 5% or more in his previously reported sales amounts.

132. Defendants have retained the benefits of this unlawful conduct and Plaintiff has been deprived thereby of his rightfully earned and due Royalty Payments and information in true, correct, and accurate Royalty Reports.

133. Plaintiff has been damaged by Defendants' conduct that has resulted in the unpaid, underpaid, and delayed Royalty Payments and by failing to receive true, accurate, and correct Royalty Reports.

134. Plaintiff has further been harmed by the lack of control and ability to define and maintain the good will and brand of the Licensed Product and since August 2016 without payment of Royalties or any sales reports as required under the Agreement.

135. Defendants, as non-exclusive licensees, are continuing to sell the Licensed Product without any remuneration paid to Plaintiff as the Licensed Products inventor, owner and patentee

136. It would be immoral, unjust and inequitable to permit Defendants to retain these benefits.

137. As a result, the Court should order disgorgement of all profits earned by Defendants under the Agreement and order those amounts rightly due and payable owed to Plaintiff due to Defendants having been unjustly enriched in excess of fifty thousand dollars ($50,000.00) and to be determined as

damages, plus prejudgment interest, post-judgment interest and all costs and disbursements.

## Count V: Injunctive Relief/Accounting

### (Against All Defendants)

138. Plaintiff restates and realleges the preceding paragraphs of this Complaint.

139. Defendants have failed to provide the accountings, reports and comply with the audit provision in the Agreement.

140. Plaintiff has made repeated demands for compliance.

141. Plaintiff has been stripped of any ability to monitor and accurately ascertain what Defendants are doing with the Licensed Product and if they are properly reporting all sales or violating the Agreement due to Defendants deliberate failure to comply with the terms and conditions in the Agreement.

142. Plaintiff and the Licensed Product are suffering irreparable harm as a result and the status quo ante must be ordered maintained.

143. Because of Defendants deliberate non-compliance with the reporting and auditing requirements under the Agreement, Plaintiff has been unable to monitor Defendant J. Peel's non-exclusive agreement and Plaintiff has thus been unable to make decisions related to further and other licensing of the Licensed Product due to the lack of information.

144. Due to the lack of control and ability to monitor the Licensed Product, Plaintiff has been unable to ascertain the goodwill associated with the Licensed Products and its current status.

145. As a result of this deprivation, Plaintiff is unable to protect, maintain and maximize the good will associated with the Licensed Product

146. Due to Defendants' failure to provide any reports since August 2016 or comply with the audit in August 2016 as required under the Agreement.

147. Plaintiff is left without any reasonable means of accurately determining the value of the Licensed Product he owns.

148. As a result, the Court should order a forensic accounting of Defendants' sales of the Licensed Product immediately by an independent, third-party accounting firm or certified public accountant to serve as an officer of the Court with all Court-determined authority and powers required to ensure full compliance with the auditing process in order to report its findings back to the Court for approval.

## COUNT VI: WRONGFUL INTERFERENCE WITH CONTRACTUAL RELATIONS
### (Against Defendant T. Peel, Defendant Stern, Defendant Thorud, Defendant Wales and Defendant Tactacam)

149. Plaintiff restates and realleges the preceding paragraphs of this Complaint.

Plaintiff and Defendant J. Peel entered into the legally binding Agreement.

150. Defendant T. Peel, Defendant Stern, Defendant Thorud, Defendant Wales and Defendant Tactacam knew of the existence of the *Agreement*;

151. Defendant T. Peel, Defendant Stern, Defendant Thorud, Defendant Wales and Defendant Tactacam all acted intentionally to procure the breach of the Agreement by conspiring to have the Licensed Product assigned, sub-licensed or transferred under the Agreement without Plaintiff's consent and by acting independently and jointly to hide the true sales numbers of the Licensed Product from Plaintiff.

152. All of Defendant T. Peel's, Defendant Stern's, Defendant Thorud's, Defendant Wales' and Defendant Tactacam's actions and inactions were without justification.

153. As a direct and proximate result of Defendants' wrongful conduct, actions and inactions alleged to interfere with and cause the breaches of the Agreement, Plaintiff has been monetarily damaged in an amount, upon information and belief, to be in excess of fifty thousand dollars ($50,000.00) and to be determined at trial.

## Count VII: Declaratory Judgment
(Against all Defendants)

154. Plaintiff restates and realleges the preceding paragraphs of this Complaint.

155. That pursuant to Minnesota Statutes section 555.02, Plaintiff is an interested party under the Agreement and is seeking to obtain a declaration of his legal rights.

156. That pursuant to Minnesota statutes section 555.11, all persons who have or claim to have any interest which would be affected by this Declaratory Judgment action have been made parties hereto and no declaration will prejudice the rights of any person not a party to this proceeding.

157. Plaintiff requests the Court to determine and declare that even if Defendants are not parties to the Agreement, they and Defendant J. Peel should be held liable for fulfilling all obligations under the Agreement and be held liable for any damages sustained jointly and severally.

## COUNT VIII PATENT INFRINGEMENT
(Against Defendant Tactacam)

158. Plaintiff restates and realleges the preceding paragraphs of this Complaint.

159. This is a claim for patent infringement under 35 U.S.C. § 271.

160. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) because this claim for infringement of a United States patent arises under the Patent Laws of the United States, 35 U.S.C. §§ 271 and 281-285.

161. Venue in this jurisdiction is proper under 28 U.S.C. Section 1400(b).

162. Plaintiff is the true and lawful owner of U.S. Patent No. 7,006,144 (the "'144 patent"), entitled "Video Camera Recorder," which was duly issued

to Plaintiff on February 28 2006. Defendant Tactacam has been and is directly infringing the '144 patent by its unauthorized making, using, offering to sell, selling, importing and/or exporting video cameras covered by at least claim 1 of the '144 patent, either literally or under the doctrine of equivalents.

163. Defendant Tactacam sells its video cameras with a notice on the packaging that the cameras are covered by multiple U.S. Patents.

164. Tactacam's website (https://www.tactacam.com/technology/) touts its video cameras as being "Weatherproof – Built to Withstand the Toughest Conditions" in "rain, sleet or snow."

165. The Tactacam 1.0 camera was advertised as "waterproof tested up to 30 meters." The Tactacam 2.0 camera packaging touts that the camera is "100% waterproof to 106 feet." Tactacam's packaging for its 3.0 and 4.0 video cameras also advertises that the cameras are "Weatherproof – Made to withstand the toughest conditions.

166. Defendant Tactacam's infringement has been with knowledge of the '144 patent and with the knowledge that its sales of video cameras infringe the '144 patent.

167. Tactacam has been and is actively inducing others to infringe the '144 patent by their offer to sell, sell, and/or use, without Plaintiff's authorization, Tactacam video cameras covered by the '144 patent.

168. Defendant Tactacam's infringement of the '144 patent has been and continues to be willful.

169. Plaintiff has suffered and will continue to suffer monetary damages as a result of Defendant Tactacam's infringement of the '144 patent in an amount to be determined at trial.

170. Plaintiff has suffered and will continue to suffer irreparable harm by Defendant Tactacam's infringement of the '144 patent unless Tactacam is enjoined from infringing the '144 patent.

**WHEREFORE,** Plaintiff prays this Court enter judgment in his favor and against the Defendants:

a) Order injunctive relief requiring an independent third-part forensic accounting of Defendants' sales of the Licensed Product made and report the results to the Court for approval;

b) Declaring all Defendants liable under the Agreement and declaring the true amount of sales made of the Licensed Product;

c) Enter a judgment that Defendants have been unjustly enriched and order disgorgement of their profits;

d) Enter an Order that Defendant T. Peel, Defendant Stern, Defendant Thorud, Defendant Wales and Defendant Tactacam have tortiously interfered with the Agreement and that Plaintiff has suffered damages in an amount in excess of fifty thousand dollars ($50,000.00);

e) Awarding Plaintiff his direct and proximate damages against Defendant J. Peel for breach of the Agreement in an amount in excess of fifty thousand dollars ($50,000.00);

f) Awarding Plaintiff his direct and proximate damages against Defendant J. Peel for breach of the covenant of good faith and fair dealing in an amount in excess of fifty thousand dollars ($50,000.00);

g) Declaring that Tactacam has infringed the '144 patent;

h) Declaring that Tactacam and its subsidiaries, parents, officers, directors, agents, servants, employees, affiliates, attorneys, and all other persons in active concert or participation with Tactacam be enjoined from making, using, selling, offering to sell, importing and exporting products covered by the '144 patent, and from inducing the infringement of the '144 patent;

i) Awarding Plaintiff a reasonable royalty in an amount to be proved at trial pursuant to 35 U.S.C. § 284, including pre-judgment and post-judgment interest;

j) Declaring that Tactacam's infringement has been willful and awarding enhanced damages pursuant to 35 U.S.C. § 284;

k) Declaring that this action is an exceptional case and awarding Plaintiff its costs, disbursements and attorneys' fees in this action pursuant to 35 U.S.C. § 285;

l) Awarding Plaintiff pre- and post-judgment interest, costs, and disbursements as permitted by law; and

m) Awarding Plaintiff all other relief that the Court deems just and equitable.

Respectfully submitted,

Dated: September 28, 2017

MKT Law PLC

By: _____

Mark K. Thompson #297343
4927 34th Avenue South
100 Nokomis Professional Building
Minneapolis, Minnesota 55417
(612) 999-2404
mkt@mktlawoffice.com

*Attorney for Plaintiff*